IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BARRY VANCE SUTPHIN,

Plaintiff,

v.                                          Civil Action No. 3:07-CV-171

MICHAEL J. ASTRUE,
Commissioner of Social Security,

Defendant.

**REPORT AND RECOMMENDATION**
**SOCIAL SECURITY**

**I. Introduction**

A.      Background

Plaintiff, Barry Sutphin, (Claimant), filed a Complaint on December 28, 2007 seeking

Judicial review pursuant to 42 U.S.C. § 405(g) and Section 1634(c)(3) of the Social Security Act

of an adverse decision by Defendant, Commissioner of Social Security, (Commissioner).[1]

Commissioner filed his Answer on July 14, 2008.[2]  Claimant filed his Motion for Summary

Judgment on August 12, 2008.[3]  Commissioner filed his Motion for Summary Judgment on

September 4, 2008.[4]

B.      The Pleadings

        1.      Plaintiff's Brief in Support of Motion for Summary Judgment.

_____

[1] Docket No. 1.

[2] Docket No. 18.

[3] Docket No. 21.

[4] Docket No. 23.

2.      <u>Defendant's Brief in Support of Motion for Summary Judgment</u>.

C.      <u>Recommendation</u>

I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because substantial evidence supports the ALJ's decision. Specifically, the Court finds that the ALJ was not bound by the Veterans Affairs finding of 100% disability. Furthermore, the ALJ showed no bias and his credibility findings were supported by substantial evidence

2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II. Facts

A.      <u>Procedural History</u>

On November 9, 2004, claimant filed an application for Disability Insurance Benefits ("DIB") alleging the onset date of disability to be October 1, 2000[5] due to residual effects, status post right hip replacement; left hip problem; multiple sclerosis; and depression. (Tr. 113). This application was denied at the initial and reconsideration levels on March 16, 2005 (Tr. 99) and January 19, 2006 (Tr. 93), respectively. On March 27, 2006, claimant submitted a request for a hearing before an ALJ. (Tr. 92). A hearing was held on May 8, 2007 at which claimant and a vocational expert testified. (Tr. 33). The ALJ denied the claim by written decision on June 19, 2007 finding that claimant was not disabled because he had no medically determinable impairments which met or equaled a listing in Appendix 1, Subpart P, Regulation No. 4 (20

---

[5] In his pre-hearing memorandum, claimant amended his operative allegation as to the date of purported disability onset from October 1, 2000 to September 1, 2000.

C.F.R. §§ 404.1520(d), 404.1525 and 404.1526) and he could perform work that existed in significant numbers in the local and national economy. (Tr. 11-22). Claimant's Request for Review was untimely filed on September 17, 2007. (Tr. 7). On October 26, 2007, the Appeals Council found good reason for claimant's delay in filing his request for review, but denied the request nonetheless. (Tr. 4). Therefore, on October 26, 2007, the ALJ's decision became the final decision of the Commissioner. Having exhausted his administrative remedies, claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was thirty-seven years old on the alleged onset date of September 1, 2000. His date of birth is November 23, 1962 (Tr. 113). Claimant was therefore a "younger individual 18-44" within the meaning of the regulations at all times relevant hereto. Claimant graduated from high school and has an associate's degree in transportation. (Tr. 45, 123). Claimant was in the military between September 19, 1982 and July 19, 1993. (Tr. 113). During his time in the U.S. Air Force, claimant was an air cargo specialist. (Tr. 47). His duties included loading and unloading airplanes using a forklift. (Tr. 47). Claimant also has prior work experience as a dump truck driver, a dock worker and a painter. (Tr. 49-50)

C.    Medical History

The following medical history is relevant to the issue of whether the ALJ erred in failing to give appropriate weight to the veterans affairs medical finding of 100% disability:

**Progress Notes, Consult Requests & Radiology Reports from VA Medical Center, 7/11/00-1/21/05 (Tr. 196-274)**
January 21, 2005, Orthopedics Consult with Dr. Kenneth Cho
As far as the right hip is concerned, he does not have any real problem, occasion[al] discomfort in the medial aspect of the thigh. He ambulates with no supportive device.

Physical Examination - Reveals a full range of motion of the hip joint on the right. Leg length is grossly equal. Flexion 100 degrees, internal and external rotation is 30 degrees. Motor strength is intact. Examination of the elbow joint reveals extension -15 degrees bilaterally. Full pronation and supination. No muscle atrophy.

Diagnostic Impression - Degenerative joint disease elbow, bilateral, nonservice connected.

December 10, 2004, Cumberland Outpatient Note, Linda K. Gee, NP
Social History - Alcohol 6-8 beer q d

July 27, 2004, Physician, Neurology Outpatient Clinic, Eugene E. Benjamin, Neurologist
History - No new complaints. He has been without Modafinil for some months and notes the difference. He has no energy off the med.

Focused Exam - Alert oriented. Full OEM no nystagmus. No weakness. Mild dysmetria R hand on finger/nose. Gait: intact, normal. Mild increase reflexes in LE's.

Impression - MS, stable.
2. MS fatigue.

Recommendations/Plan - Restart Modafinil

June 9, 2004, Cumberland NP Note, Linda K. Gee, NP
Chief Complaint - routine visit for f/u of chronic medical problems

History of Present Illness - General tolerance to treatment: patient reports that he can do ADLs without problems. Has MS and is to see neuro q year. Has missed his appt. and is without medication. Denies weakness. Reports no problems with current medications.

Social History - Alcohol 3-4 beer q d

Review of Systems - No chest complaints, no GI or GU complaints, good exercise tolerance, no neuro-psych complaints, not abnormal weight loss, energy level stable.

December 10, 2003, Cumberland 1st Visit Note, Michelle M. Rocca, M.D.
History of Present Illness - Patient only has fatigue associated with MS at this time - episodes of dropping objects occurred a few months ago, but now resolved.

Assessment - Patient with MS stable.

June 10, 2003, Eugene E. Benjamin
Only continued MS related symptom is daytime fatigue. It did respond well in past to Modafinil.

Impression - MS, stable course, recent facial numbness likely related to this underlying

condition.

July 11, 2000, Eugene E. Benjamin
37 yr old man with history of MS, and now recent exacerbation.  Initially started with what sounds like Optic Neuritis in the right eye; vision never improved.  Since then, has fatigue symptoms.  This episode began in April with R sided numbness, weakness.  MRI 9 years ago (when he first began having symptoms), and now confirm MS.  He also has R hip replacement.  Current meds include Provogil, and Avonex.  His R sided symptoms have not improved, and he lost his job over it.

Social - Drinks 4-5 beers per night.

Impression - MS with recent exacerbation.  So far sounds like relapsing-remitting type.

September 11, 2000, Harrisonburg Outpatient Progress Note, Arthur Strunk, F.N.P.
Subjective - In general feels well.  Continues with numbness in his extremities, off/on.  This usually does occur at least once every day.  Generally it will last all day when it does occur.  Right hand is most often affected, but it can be bilateral, and occasionally also felt in his feet.  Has decreased strength with the episodes of numbness.  Denies any imbalance, headaches, dizziness, lightheadedness.

Objective - Normal range of motion of all the extremities, with 5/5 grip strength bilaterally.

**Physical RFC, 2/16/05, Dr. Ali Lateef, (TR. 275-282)**
Exertional Limitations:
1.  Occasionally lift and/or carry 20 pounds
2.  Frequently lift and/or carry 10 pounds
3.  Stand and/or walk for a total of about 6 hrs. in an 8 hr. workday
4.  Sit for a total of about 6 hrs. in an 8 hr. workday
5.  Push and/or pull unlimited

Postural Limitations:
Claimant can frequently climb ramps/stairs, stoop, kneel and crouch.
Claimant can occasionally climb ladder/rope/scaffold, balance and crawl.

No manipulative limitations.  No visual limitations.  No communicative limitations.  No environmental limitations.

Symptoms:
-Status Post right total hip arthroplasty, xrays of hip o.k.  Encouraged to walk by his physician
-History of MS, appears to be under control
-Degenerative joint disease of elbows
-Considering above, especially MS and lack of energy, RFC reduced

**Psychiatric Review Technique (Tr. 283-296)**
No medically determinable impairment. Coexisting nonmental impairments that require referral to another medical specialty.

Claimant is a 43 year old male who alleges depression. There is no history of any psyc treatment or medication. On 6/04 at the VAMC, a depression screen was performed and was negative. There is no diagnosis of depression in his records. His activities of daily living are limited by physical c/o. He does have a history of alcohol abuse.

**WV Disability Determination, 10/18/2005, Tracy Cosner-Shepherd, M.S. (Tr. 297-302)**
Chief Complaints - He is applying for disability because, "can't go back to work...my hip...I've got multiple sclerosis."

Onset Date - at 29 years of age

Work interference - reported as of 29/30 years of age

Disability date - stated that he last worked in 1990

Work return attempts - stated that he tried going back to work in 1991 or 1992 but was only able to last 6 months and has not made any further attempts since that time.

Review of medical records - past medical history of MS. Diagnostic impression was of 13 years post total hip replacement and degenerative joint disease, elbow, bilateral.

Substance abuse history - Drinks alcohol every evening; about 12 to 14 beers a night. Said he has been drinking to that extent for the last 7 to 10 years.

Diagnoses -
Axis I      307.89 Pain disorder associated with both psychological factors and a general
                 medical condition, chronic.
            311     Depressive disorder, NOS
            303.90 Alcohol dependence
Axis II     No diagnosis
Axis III    MS, History of right hip replacement, poor hearing and vision

**WV Disability Determination Service, Susan Garner, M.D., 10/31/2005, (Tr. 303-309)**
Social History - reports that he drinks constantly
Impression:
    1.      Right hip pain status post right hip replacement
    2.      MS
Summary:
This is a 42-year old male who had his right hip replaced for avascular necrosis in 1990. He has mild residual pain. On examination today, he was able to flex normally at the hip. There was no

tenderness on palpation over the hips. He could complete the straight leg raise test to only 60 degrees and did have some pain reproduced in his hip area at that point. He ambulated without an assistance device. He had a slightly antalgic gait. He was able to arise from a seated to a standing position and step up and down from the examination table.

He says that he was diagnosed in 1989 with MS. On exam today he had no evidence of muscular weakness on manual muscle testing. His deep tendon reflexes were well preserved. He did not have any ocular symptoms, such as nystagmus or strabismus. He had no lid lag. Pupils were equally round and reactive to light. His speech was not slurred. He had no facial drooping.

## Psychiatric Review Technique (Tr. 310-323)
Medical Disposition - Impairments NOT severe.
Categories upon which the medical disposition is based:
>  -12.04 Affective Disorders
>  -12.07 Somatoform Disorders
>  -12.09 Substance Addiction Disorders

12.04 - Medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Depressive disorder not otherwise specified

12.07 - Medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Pain disorder associated with psych and med. factors per CE

12.09 - Medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above: Alcohol dependence per CE

Consultant's Notes - Claimant's credibility seems questionable. Reported symptoms of anxiety/depression are mild, sometimes vague. Claimant continues to drink daily. Some decrease in activities noted; occasionally goes hunting. Symptoms do not meet listings.

## Physical RFC (reconsideration), 12/23/05, Cynthia Osborne, DO (Tr. 324-331)
Exertional Limitations: No changes from February '05 RFC.

Postural Limitations:
Claimant can never climb ladder/rope/scaffolds and can occasionally climb ramp/stairs, balance, stoop, kneel, crouch and crawl.

No changes in Manipulative, Visual or Communicative Limitations.

Environmental Limitations:
Claimant should avoid concentrated exposure to extreme cold and hazards such as machinery, heights, etc.

Symptoms:
No significant ADL limitations.
Complaints are mostly credible and support a lower RFC to light limitations as indicated.

He is able to stand on one leg at a time without difficulty.  Neuro intact.  He is able to heel walk, toe walk, tandem walk and squat without difficulty.  He has full ROM.  Straight leg raise was 0-60% on right.  Muscle strength 5/5 throughout.

Ability to Perform Daily Living Activities - He has no difficulties completing his personal care needs.  He can prepare simple meals.  He uses a riding mower to cut grass.  He states that he likes to hunt, but has a hard time getting around, which is not consistent with physical findings.

**Dept. Of Veterans Affairs Medical Center (Tr. 332-391)**
12/23/05
Impression - MS stable, probable right arm radiculopathy (mild).

**Winchester Neurological Consultants (Tr. 392-398)**
Claimant presents with a complaint of arm pain.

Assessment and Plan:
Right arm pain NO weakness

Impression:
Claimant appears to have a right C7 radiculopathy secondary to a disk herniation at C6-7.

D.      Testimonial Evidence

        Testimony was taken at a hearing held on May 8, 2007.  The following portions of the

testimony are relevant to the disposition of the case:

        ALJ             But you understand I'm not bound by the VA records.  Our criteria is

different than veteran's records.

        CLMT            Yes, sir.

        ALJ             In fact, you know, I mean most of us have retired from the military and

served even during Vietnam and I'm aware of the requirements of the Veteran's Administration.

They're entirely different from what our rules and regulations are and I'm required to apply our

rules and regulations to your case.  All right, sir, do you have any objections to taking an oath?

CLMT        No, sir, I do not.

(The Claimant, Barry V. Sutphin, having been duly sworn, testified as follows:)

Q      And when were you, did you retire?

A      I medically retired, sir.

Q      Medically retired.

A      Yes, sir.

Q      And you retired when?

A      1990.

Q      And during that period of time, what would you classify your work?

A      I'm sorry, it was '93.

Q      '93.

A      Yes, sir.

Q      Thanks.  And your medical condition was MS?

A      Yes, sir.

Q      Anything else?

A      The artificial hip.  TK - -

*          *          *

Q      E5.  And when did you last work at any job for wages, 2000?

A      2000.

Q      And what were you doing when you last worked in 2000?

A      I was working for Marigold, loading and unloading truck trailers.

Q      And how did you do that?

A       With a forklift.

Q       Forklift?

A       Yes.

Q       And can you give me an opinion as to how many years you did that?

A       It was nine months.

Q       Nine months?

A       Yes, sir.

Q       Were you hurt on the job?

A        My Multiple Sclerosis flared up on me and I lost my peripheral vision and stuff going into tractor trailers.

Q       Did you get fired or just voluntarily quit?

A       No, they actually terminated my position.

Q       And did you draw unemployment?

A       No, sir, I did not.

                              *              *              *

Q       Okay.  All right.  Now, Counsel, you've heard us talk about your conditions.  I noted the Veteran's Administration said you retired on MS with the residuals of fatigue.  You have 13 years from the time you retired with your hip replacement and that was on your right hip?

A       Yes, sir.

Q       I'm showing a, are you seeing a psychologist or a psychiatrist?

A       No, sir, I do not.

Q        Do you take any medications for any mental conditions?

A        No, sir.

Q        And then off you went to the VA, talking about your elbow.

A        Yes.

Q        Right or left?

A        My right one.

Q        And it's in like a tarsal tunnel?

A        They can't figure it out.

Q        But you haven't had surgery?

A        No, sir.

Q        No releases or no, sometimes they transpose that nerve, you know, they do a nerve transposition.  Have you anything done like - -

A        The VA, when they run an x-ray on it, they said they couldn't find anything wrong with it.

Q        How does it limit you?

A        If I carry anything at all in that right arm - -

Q        Hurt - -

A        - - I have a hard time setting it down.  To straighten my arm out, just, it like pulls real hard right in here.

Q        Okay.  And my last question is - -

A        Excuse me.

Q        - - how's the alcohol?  What role does alcohol play in your past?

A    In the evening times, after I eat dinner, I'll sit down and have a couple beers, try to get some of the pain off my foot, my leg.

Q    Well, you haven't worked since 2000.

A    Yes, sir.

Q    Do you still drink?

A    Yes, sir, I do.

Q    You know, socially is one thing but you know, drinking to the level of impairment, what is your testimony with respect to that?  I mean, do you just - -

A    I drink about three or four beers every, well I can say it's strictly to ease some of the pain so I can sleep at night.

Q    Does it cause you any problems in your legs?

A    No, sir.

Q    You know, the Veteran's Administration says they call it peripheral neuropathy from ethanol, ethanolic and that means alcohol peripheral neuropathy.  Is it starting to affect your legs?

A    No, sir.

                    *            *            *

Q    Do you take any medication at all?

A    I take medication strictly for energy, just keep me awake throughout the day.

Q    What's that?

A    It's Megathonol [ph]

Q    No medication for Multiple Sclerosis?

A        No, sir, I was taking injections for approximately six months.

*                *                *

Q        Okay.  What aggravates your conditions?

A        Anything.  When I wake up in the morning time it hurts.  When I go to bed at night it hurts even worse.

Q        Okay.  Your treating doctor is the VA?

A        Yes, sir.

Q        Except for that Winchester visit to the neurosurgeon?

A        Yes.

Q        And you're not taking any medications other than the, you said a vitamin, not a vitamin but - -

A        Energy medication.

Q        Energy medication.

A        That's it.

Q        And anything else?  Do you take anything over the counter?

A        No.

Q        Okay.  Do you do anything at home?  Soaks, heating pads, anything like that?

A        From time to time I will soak in a bathtub, hot bathtub.

Q        How far can you walk on level ground?

A        75 to 100 yards.

Q        Even with your foot problem?

A        Even with the foot problem.

Q       Standing is limited to how long?

A       15, 20 minutes at tops, very tops.

Q       Any limits on your ability to bend, stoop or squat?  Those are pretty close together, you know, there's not a lot of difference?  I'm thinking of your hip, your, you know, all the things that you're talking about.  Do you have any limits?  Can you bend at the waist?  Can you bend forward?

A       I can bend forward some but I do have a little bit of the, they said it's not full motion.

Q       Can you take your knees and squat straight down, cause your hip to hinge?

A       No, sir, I cannot.

Q       Any problems with your left hip?

A       Not recently.  I haven't had it checked but they say I will pretty soon have to come back for a check on that because it can be a replacement too.

                        *               *               *

Q       Can you make a fist with both your hands?

A       Both of them.

Q       Do you have grip?

A       Right hand, yes.

Q       How much grip do you have?

A       The right hand, I lose it after a couple minutes.  If I grab a 16 pin nail, it just, I lose the hammer.

 Q       You mean with a hammer?

A        Yes, sir.

Q        Feeling, do you still have feeling in your hands?

A        The right hand numb all the time.  They said that's stemming from the neck problem.

Q        Okay.  So for the '01 to now, it changed all of a sudden as a result of your neck condition?

A        Yes, sir.

Q        Can you use your hands to just do some fine and gross manipulation?  For example, can you dress yourself, button your buttons, pull your shirt on over your head?

A        I normally wear a pocket t-shirt now because I have problems with buttons.

Q        All right.  And then hold a fork and spoon, hold a glass, things like that?

A        At times, with a glass, I always pick it up with my left hand because I lose grip from time to time.  Never know when I'm going to lose the grip.

Q        What are you limited on lifting?  What do you lift on a routine basis?

A        Most of the time a glass.

Q        Full or empty?

A        Well most times it starts out full.

Q        I was thinking of milk or sugar, of things like that.  Things you just do on a routine, half a gallon of orange juice - -

A        I can pick up - -

Q        Something crazy.

A        - - a gallon of tea out of the refrigerator.

Q       Pull a gallon out?

A       Yes, sir.

Q       Dump it - -

A       Pour it and put it - -

Q       - - put it back in ?

A       - - right back in.

Q       Sitting like you are now?

A       It tends to bother my hip.

Q       What would be the maximum you could sit without having to - -

A       The most I could sit here would be about a half hour, 45 minutes.

Q       Now, do you have problems with memory?

A       Yes.

Q       What is your problem?

A       I forget everything anymore.  And if I'm, try to do anything at the house, I'll try to do something every now and then.  Get a piece of lumbar out, measure it.  If somebody speaks to me, I better have another measurement.  I get very frustrated when stuff like that happens.  My son comes in.  He'll ask me a question and I was just getting ready to cut a board or something and I just go off the deep end on him.  I'm like leave me alone I'm trying to measure stuff.

Q       So you do some carpentry work at home?

A       Yes, sir.

Q       TV, can you follow a sporting event or baseball game or a show?

A       As long as it's not a long one.

Q Not a long?

A Yes.

Q Yeah.

A Anything over a half hour, watching TV, I'll go to sleep.  I'll wake up and it's a different show.  I'm like, what happened?  Why'd you change my channel.  She's, I didn't change the channel.

Q But I mean while you're watching it, do you understand what you're watching - -

A Yes, sir.

Q - - up until you fall asleep and - - Okay.  Are crowds a problem for you, crowds of people?

A Big crowds, yes.

Q And that would be what numbers?

A 20 to 30 people.

Q Okay.  Strangers a problem for you today?

A No, sir, they're not.

Q Do you have any breathing difficulties?

A No, sir.

Q Do you have a smoking history?

A Yes, I do.

Q And would that be for most of your life?

A I've been smoking since I was 14 years old.

Q And what would you describe your use to be?

A       Two to three packs a day.

Q       You're wearing glasses?

A       Yes, sir.

Q       Do you need those to read for distance or close up or what?

A       Both.

Q       Both?

A       Yes, sir, I do.

Q       Any glaucoma or cataract?

A       No.

Q       I don't see any hearing aides in your ears.

A       No hearing aides.

Q       Any difficulty hearing me today?

A       No, sir.

Q       Now, the VA benefit is around $2,500 a month.

A       Yes, sir.

Q       For 100 percent?

A       Yes, sir.

Q       Retired medical disability for MS and your hip?

A       Yes, it was.

Q       And your sleep is limited to how much?

A       I'll sleep most of the time 12 to 14 hours out of the course of a day.

Q       Continuous?

A        Yes.

Q        Do you take anything to sleep?

A        No.

Q        Okay.  With respect to your ability to take care of yourself, for example, shower and bathe, trim your beard, wash your hair, perform your personal hygiene requirements, toileting, can you do all that?

A        I do all of it except for trim my beard.

Q        A barber?

A        I get a barber or have the wife, I turn her loose on it every now and then.

Q        All right.  So generally you can take care of yourself?

A        Yes, sir.

Q        And generally the wife does the cooking but do you do any?

A        I try to stay away from the stove now.

Q        No grilling or anything?

A        I very, no.  I turn my son loose.  He's 10 years old.  He works on the grill now.

Q        Do you know how to use a microwave?

A        Yes, I do.

Q        Could you make a sandwich?

A        I could make a sandwich.

Q        Do you eat out a lot?

                        *                *                *

Q        All right.  Your hobbies and activities, it sounds like to me you like to play with

carpentry?

A      Yes, I do.

Q      You still do that?

A      I try from time to time.

Q      Now what, when you say that, are you making things, furniture, things like that or what are you doing?

A      I used to make a lot of corner shelves for my wife, for my mother.  Now I can't do it.  I get frustrated if I get the wrong cut on the board.

Q      So you have a shop, a little shop and - -

A      Yes, sir.

Q      What do you spend your time doing now then?  I mean just -

A      Just most of the time sitting around the house, watching TV.

Q      So you've given up carpentry?

A      Mostly, yes.

Q      What else have you give up, some of the things you used to do that you don't do anymore?

A      I used to hunt every chance I got.  I loved to hunt.

Q      When was the last time you had a license with the DNR?

A      I still buy a license every year.  I take my son hunting.

Q      Did you go hunting in '06 in the - -

A      Yes, sir.

Q      - - winter?

A       I took my son with - -

Q       Deer hunting?

A       Yes, sir, right up on the hill behind the house.

Q       Did he do any good?

A       He did excellent.

Q       How do you get up and down the hills?

A       I ride my four wheeler up there.

Q       Okay.  So that, it's okay for you to ride a four wheeler?  I doesn't jar you or anything over the terrain?

A       Most of the time I drive my truck up there because I know the old man that owns the farm but if he kills a deer, I find it's easier to get it on the four wheeler.

Q       And fishing?  Do you fish too?

A       I love to fish but I get bored with it.

Q       Do you got a license there too?

A       Yes, sir, I do.

Q       Okay.  When was the last time you went fishing?

A       I haven't been yet this year.

Q       What about last year?

A       Last year I only went twice in the whole summer.

Q       Bank, the lake or boat?

A       I sit on the bank, that way I can take a nap, don't have to worry about falling in the water.

Q       Anything else you've given up?

A       Bowling.  I used to love to bowl.  I can't do that anymore.

Q       When was the last time you say, my period is this '01 to '07.  I've got to cover six years.  Have you been bowling in six years?

A       No, sir, I haven't.

Q       Okay.

A       I have not bowled.

Q       Do you do any housework around the house?  Do you do any chores?

A       From time to time I'll try to surprise the wife and vacuum the house but that usually turns into a worse problem than it was.

Q       Take out the trash, anything like that?

A       My son takes the trash out.

Q       Okay.  So you don't do any shopping at all?

A       Only time, from time to time I'll get on the computer and shop for some hunting clothes for my son, myself, my wife.  Other than that, I walk in the grocery store with her maybe 10 or 15 minutes and I tell her I've got to go back to the car.  I'll go back and sit in the car.

Q       And the computer use, if you were to try to describe to me how often you sit and use a computer in a week or a day or?

A       Oh, I'd say about every three or four months I might get on it.

Q       Do you help out with any laundry duties or anything?

A       No, sir, our laundry room is downstairs.

Q       Okay.  Now, do you work on your car?  Do you mow grass?  Do you have a

garden?  Do you work in flowers?  What do you do?

     A       I have a garden, the only thing I go out and I have the hug man come in.  He tills it for me, plows it and everything and my wife takes care of the garden.  I try to do automotive work but I also got my son into that too now. I rely on my son for pretty much everything but at the same time I'm teaching him a whole lot.

     Q       Do you belong to any clubs, organizations, churches, lodges or attend meetings?

     A       No, sir, I do not.

     Q       The home in which you live, is it more than one story?

     A       Yes, it is.

     Q       Two stories?

     A       The basement and the first floor is all it is.

     Q       Washer and dryer in the basement?

                *          *          *

EXAMINATION OF CLAIMANT BY ATTORNEY:

     Q       Mr. Sutphin, let me ask you about, he asked, His Honor asked you about the drinking.  Is it true that the only time you do drink is at night?  Is that the only time?

     A       Yes, sir.

     Q       And what, do you ever go days without it?  I mean, do you ever go days, evenings?

     A       From time to time I'll go two or three days at a time.

     Q       Okay.  And how much do you say you have on average?

     A       I would say three, four, maybe five beers a night.

Q      Okay.

A      No, I'd say it depends on how bad my foot's bothering me or my hip either one.

Q      You say you sleep for a long period of time.   What, again, is that right, like 12 hours a day.

A      At least.  At the times same time, I can go sometimes I only get four or five hours of sleep but I'll sleep 20, 30 minutes throughout the day like three or four times through the day.

Q      Now, I noticed that through the medicals here, we were talking about the neck problem that you had.  I noticed that you, the most recent, you know, the furthest back date we can find in these medicals was July of 2006 when it said you had a four week history of the neck pain.  Had you had any problems prior to that in - -

A      Yes, I had.

Q      When did you, when from your period of time, did you, when from your recollection do you know how long it was before you went to Winchester that you - -

A      Approximately a year.

Q      Had you had problems about the middle of the year - -

A      Yes.

Q      - - before?  Did you say anything to the people at the - -

A      I said it to Dr. Benjamin and just recently, the last visit I made with Dr. Benjamin, I was explaining some of the medical problems I was having and I didn't realize until after I had gotten back here that he wrote in the records patient has no further problems and the problems that I discussed with him I had never said to anyone before.

Q      So it talked about a four week history here in this Winchester Neurological thing.

So you're saying that's not right. That was in July of '06?

A    No.

Q    That isn't correct?

A    No, there's not.

Q    Okay. Now, who, how did you get to Winchester? Were you went there from them, did the VA send you?

A    Yes, they sent me there.

Q    Okay. Do you know how far, you know how long you waited for your appointment before you were seen there? Were you seen pretty much right or did they - -

A    It was roughly three months.

Q    Okay. Tell me again about your, you were speaking again to Judge Mills about your problems with your hands and your numbness. How long have you had it so that your right hand has been numb?

A    I've the numbness in two of the fingers there for over a year.

Q    Okay. And the first two fingers you're saying?

A    Yes. Now, did you not have a problem with them, with your right extremity when you stopped the job? When you worked at the, didn't you have a problem with your right arm - -

A    Yes.

Q    - - related to the MS?

A    Right.

Q    Tell us about that. Tell us about how that came into play. I think you said you're

no longer, you know, you lost your job.  They said they terminated you there but tell us what was happening at the job that led to that.

A        I was driving a forklift and went into a truck to unload it and I actually hit the front of the truck and I thought I had about another ten feet to go and I was there.

Q        So what was the problem?  You lost your perception of where you were?

A        Yes, sir.

Q        Were you having trouble driving during that period of time, driving your car and such?

A        Very much, very much.  I couldn't drive a car.  I actually called my wife to come pick me up and she took me straight over to the hospital there in Winchester or Strausburg.

Q        Okay.  As far as your symptoms now with that goes, what do you notice, if anything currently that you have as far as the MS goes?

A        I drop a lot of stuff - -

Q        Okay.

A        - - with my right hand.  That's why I'm trying to get used to working with my left hand but I can't do anything with my left hand.

Q        So was that there present before, what I'm trying to differentiate between that and the tarsal tunnel  you were talking about because those symptoms would have something to do with that.  Were you having problems with the grip strength prior to the diagnosis of your - -

A        No.

Q        - - elbow?

A        No.

Q       Well, when was that diagnosed, the elbow thing?

A       The tarsal, I would say that's been at least five or six years ago.

Q       Okay.

A       And they told me there's nothing they can find.

Q       Okay.

A       In fact until I came to you, and you said something about the tarsal tunnel, I've never heard of that before.

Q       Okay.  So the doctor had never told you?

A       They never explained anything at the VA.

Q       Okay.  what is this Motofanel [ph] that you're taking again?  I've never heard of anything like that.  What is, just for my benefit, what is that?

A       They say it's an energy medication.

Q       Okay.

A       At the same time, I sat one day I was in Virginia visiting and my sister actually picked it up and she took one of them and within 20 minutes she had to take a nap.

Q       Well, why would she take your medication?

A       She was wore out.

Q       Okay.

A       To me I thought it was kind of crazy but - -

Q       Yeah.  So what's it, I mean what is it related to?  What condition?  I mean what condition do you get it - -

A       For the Multiple Sclerosis.

Q       Is that, is it for under that?  Okay.

A       No, sir.

Q       Or anything like that.  Okay.  Do you have any problems with that at this point do you think?

A       I get depressed from time to time, know the stuff I used to be able to do and now I can't or if I'm watching my son, he's trying to do something.  I'm telling him how to do it and I get frustrated very easy and I get on him.

Q       That you can't help him or is that why you're frustrated with yourself or - -

A       Yes.

                        *                   *                   *

Q       All right.  Would you classify the exertion and the skill level of his past work?

A       Work as a dump truck driver, exertional level is medium, skill level is unskilled.  Work as a forklift operator, exertional level is medium, skill level is semi-skilled and work as a self-employed painter, exertional level is medium and the skill level is skilled, Your Honor.

Q       It appears that the Claimant is between the ages of 38 and 44, roughly if we use 2000 but I'm only 2001.  So we're still within that younger individual category.  He has a high school education, an Associates degree in transportation from, he acquired in the military.  And the past relevant work at the medium level ranging from skilled to un-skilled.  The State Agency in this case for a hypothetical individual in the record at Exhibit B2F, B7F indicated that such a person could do the light exertional level of work activity.  The standing and walking as described in the form for this was six hours in an eight hour day with normal breaks, sitting six hours in an eight hour day with normal breaks, never climb any ladders, ropes or scaffolds,

occasionally climb ramps and stairs, avoid concentrated exposure to temperature extremes of cold weather and the hazards of moving plant machinery and unprotected heights. The first question of course would be at the light exertional level of work activity, if this person had the same work history as the Claimant, would the work be precluded?

A      It would be precluded, Your Honor, and that's because it's rated at the medium exertional level.

Q      Now, I want you to consider the light hypothetical that I've given you previously but I want you to limit such a person to also no overhead reaching with the right upper extremity, or left, bilateral, no overhead reaching with bilateral upper extremities. The other, never climb any ladders, ropes or scaffolds, occasionally climb ramps and stairs and avoid concentrated exposure to cold temperatures and hazards of moving plant machinery in any areas involving unprotected heights. Further consider that such an individual would be limited to simple, routine, type work activity, commonly referred to as unskilled work. Now, using your experience as a vocational expert and your knowledge of the regulations of Social Security and of course defining the region that you're testifying about, would there be any jobs that exist in the national or regional economy an individual could perform with that hypothetical?

A      The region I'll be using is all of West Virginia, Western Maryland, Western Pennsylvania. Under the light exertional level, Your Honor, a mail clerk, 202,000 nationally, 2,300 regionally and I'd reduce those numbers in half, Your Honor, because the hypothetical includes no overhead reaching bilaterally and that's based upon my experience in placing individuals.

Q      So that was mail clerk and what else or was that the only you - -

A       That's the only one I've given so far, Your Honor.

Q       Oh, I'm sorry.  that's not, I believe you mentioned earlier, is that the postal mail clerk or is that - -

A       That's business.

Q       Business.

A        Private business.  Also under the light exertional level, an usher, 190,000 nationally,  1,700 regionally and those are a sample, Your Honor.

Q       All right.  I'm more persuaded that the hypothetical person could only do sedentary work.  I want you to consider 10 pounds occasionally, 5 pounds or less frequently in terms of lifting and carrying and predominantly sitting six hours in an eight hour day, standing and walking would be no more than two hours in an eight hour day.  That would be overhead reaching would still be appropriate.  The never climbing of any ladders, ropes or scaffolds, occasionally go up ramps and stairs, avoid concentrated exposures to temperature extremes of cold and the hazards of moving plant machinery at unprotected heights and limited to unskilled work, one to three steps.  If that would be the case, would there be jobs that you could identify with that hypothetical at the sedentary exertional level?

A       At the sedentary level, Your Honor, a general sorter, 25,000 nationally, 900 regionally.  A bench worker, 103,000 nationally, 2,100 regionally, 2,100.  Those are a sampling, Your Honor.

Q       Okay.  I want you to consider that if alcohol use is material a finding of disability for any and all of the relevant periods as to preclude even the ability to maintain attention and concentration or pace to accomplish an eight hour work day, five days a week.  In fact that

ability to do that would rise to the level or marked, if that would be the case, would jobs be precluded?

A        Yes, they would be, Your Honor.

Q        Now, consider that I find Mr. Sutphin to be completely credible supported by his medical evidence as to his testimony so as to eliminate all exertional levels of work activity and no ability to even do an unskilled type job involving one, two, three step type tasks.  If that would be the case, could you identify any jobs that that  person could perform?

A        No, I would not be able to identify any jobs, Your Honor.

Q        Now, I want you to tell me whether or not your testimony, in describing the exertion and skill level of the past work, the responses to the hypotheticals, consistent with the Dictionary of Occupational Titles?

A        It is, Your Honor, except for the ones where I reduced the numbers because of the overhead reaching and that's based upon my experience in placing individuals.

*                *                *

E.        Lifestyle Evidence

The following evidence concerning claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how claimant's alleged impairments affect his daily life:

Claimant takes care of his son and gets him off to school in the morning. (Tr. 133)

Claimant is able to prepare sandwiches for himself. (Tr. 134)

Claimant mows the lawn every 2 weeks. (Tr. 134)

Claimant goes outside once or twice daily. (Tr. 135)

Claimant walks and drives a car. (Tr. 135)

Claimant shops once or twice a year for hunting equipment for his son. (Tr. 135)

Claimant is able to pay bills, and handle checking/savings account. (Tr. 135)

Claimant watches television, hunts and fishes. (Tr. 136, 65)

Claimant can lift 25-30 lbs. and walk short distances. (Tr. 137)

Claimant cannot stand for long periods. (Tr. 137)

Claimant drinks three or four beers per day. (Tr. 52)

Claimant can walk 75 to 100 yards and can stand for up to 20 minutes. (Tr. 57)

Claimant can sit for up to 45 minutes at a time. (Tr. 60)

Claimant does some carpentry work at home. (Tr. 61)

Claimant smokes 2-3 packs of cigarettes per day. (Tr. 62)

Claimant can shower and bathe himself. (Tr. 63)

Claimant occasionally rides on a four-wheeler. (Tr. 65)

### III. The Motions for Summary Judgment

A.     Contentions of the Parties

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, claimant alleges that the ALJ failed to give appropriate weight to the Veterans Affairs medical finding of 100% disability.  Claimant also alleges that the ALJ's credibility findings were biased and prevented claimant from receiving a fair and impartial decision.

Commissioner maintains that substantial evidence supports the Commissioner's decision and that the ALJ was not legally bound by the VA's determination of disability.  Commissioner further contends that substantial evidence supports the ALJ's credibility determination and that claimant

retained the RFC to perform a wide-range of unskilled sedentary work.

B.  The Standards.

1.  Summary Judgment.  Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.  Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.  Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.  Social Security - Medically Determinable Impairment.  The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable

clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); Throckmorton v. U.S.

Dep't of Health and Human Servs., 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§

404.1508, 416.908.

5. Disability Prior to Expiration of Insured Status- Burden. In order to receive

disability insurance benefits, an applicant must establish that she was disabled before the

expiration of her insured status. Highland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42

U.S.C. §§ 416(I), 423C; Stephens v. Shalala, 46 F.3d 37, 39 (8th Cir.1995)).

6. Social Security - Standard of Review. It is the duty of the ALJ, not the courts, to

make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to

determining whether the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied, not to substitute the Court's judgment for that of the

Secretary. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. Social Security - Scope of Review - Weight Given to Relevant Evidence. The

Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently

explained his rationale in crediting certain evidence in conducting the "substantial evidence

inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot

determine if findings are unsupported by substantial evidence unless the Secretary explicitly

indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231,

235-36 (4th Cir. 1984).

8. Social Security - Substantial Evidence - Defined. Substantial evidence is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat

less than a preponderance.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9.      Social Security - Sequential Analysis.  To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether Claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the Claimant can perform her past work; and 5) whether the Claimant is capable of performing any work in the national economy.  Once Claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment.  If the Claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the Claimant can perform some other job.  Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

10.     Social Security - Substantial Evidence - Listed Impairment.  In order for the reviewing court to determine if the Secretary based the agency's decision on substantial evidence, the decision must include the reasons for the determination that the impairment does not meet or equal a listed impairment.  Cook, 783 F.2d at 1168.  The ALJ must identify the standard to be applied.  Id. At 1173.  The ALJ should compare each of the listed criteria to the evidence of Claimant's symptoms and explore all relevant facts.  Id.

11.     Social Security - Listing.  The ALJ must fully analyze whether a Claimant's impairment meets or equals a "Listing" where there is factual support that a listing could be met. Cook , 783 F.2d at 1168.  Cook "does not establish an inflexible rule requiring an exhaustive point-by-point discussion in all cases."  Russell v. Chater, No. 94-2371 (4th Cir. July 7, 1995)

(unpublished).[6]  In determining disability, the ALJ is required to determine whether Claimant's condition is medically equal in severity to a listing.  20 C.F.R. §§ 404.1529(d)(3), 416.929(d)(3). The ALJ is required to explain his findings at each step of the evaluation process so that the reviewing court can make determinations on whether his decision is supported by substantial evidence.  Gordon, 725 F.2d 231.  See also Myers v. Califano, 611 F.2d 980, 983 (4th Cir. 1980).

12.     Social Security - Claimant's Credibility.  "Because he had the opportunity to observe the demeanor and to determine the credibility of the Claimant, the ALJ's observations concerning these questions are to be given great weight."  Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976).  "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference.  See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997).  We will reverse an ALJ's credibility determination only if the Claimant can show it was 'patently wrong'"  Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000) citing Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990).

C.     Discussion

1.     The ALJ's failure to give appropriate weight to the VA finding of 100% disability

In July 2000, claimant visited VAMC complaining of fatigue-like symptoms and right-side numbness and weakness since April.  He began Avonex therapy at this time.  (Tr. 259). Claimant saw a family nurse practitioner, Arthur Strunk, in September 2000.  (Tr. 230-31). Claimant exhibited normal range of motion of his extremities and his grip strength was 5/5.  His neurologic exam and gait were normal.  His MS was stable.  (Tr. 231).  Claimant remained on

---

[6] See FN 7.

36

Avonex therapy for about one year. (Tr. 258).

In June 2003, claimant again saw Dr. Benjamin at the VAMC. He advised that his MS had remained stable and denied any weakness or incoordination. (Tr. 258). His only MS-related symptom was daytime fatigue. (Tr. 259). Dr. Benjamin prescribed Modafinil. Dr. Benjamin further determined that claimant's MS was stable. (Tr. 260).

Claimant returned for a routine follow-up visit in June 2004. (Tr 212-16). He had missed interim appointments and had run out of medication. Despite this, he reported that he had conducted his activities of daily living "without problems." (Tr. 212). He was examined by Linda Gee, N.P. He denied having any weakness (Tr. 212) and said his energy level was stable. (Tr. 214). His neurologic exam revealed no gross focal deficit. (Tr. 213). Ms. Gee determined claimant's MS was stable. (Tr. 214).

Claimant again saw Dr. Benjamin in July 2004. Claimant had no new MS complaint, but had less energy since running out of Modafinil. (Tr. 211). Claimant showed no exacerbation of his MS and Dr. Benjamin, concluding his MS was stable, re-instituted Modafinil treatment. (Tr. 211).

In December 2004, claimant returned to VAMC for a routine follow-up visit. (Tr. 200-04). He had no neuro-psychological complaints. His exercise tolerance was good and his energy level stable. (Tr. 200). He had no gross focal deficit on neurologic PE. Ms. Gee determined claimant's MS was stable, and told him he should exercise. (Tr. 201).

Claimant returned to see Dr. Benjamin in January 2005. (Tr. 198-99). He reported that his fatigue had improved since Modafinil was re-instituted. He identified no new motor or sensory problems. His neurologic exam was intact. (Tr. 198). Claimant also visited VAMC in

January 2005 requesting an orthopedic evaluation of his right hip.  (Tr. 233-36).  He denied having any "real" problem with his right hip, though.  He also complained that he could not fully extend his elbows.  He denied injuring his elbow, and attributed the problem to carrying a tray when he was in the service.  (Tr. 234).   Kenneth Cho, M.D., examined claimant.  (Tr. 233-36).  Claimant exhibited full range of motion of his right hip joint; his leg lengths were grossly equal; and his motor strength was intact.  (Tr. 234).  Dr. Cho reviewed claimant's right hip x-rays (Tr. 261), which revealed "excellent" fixation of his non-cemented hip prosthesis and "excellent" canal filling.  (Tr. 234, 261).  Also on PE, claimant could fully pronate and supinate his elbows.  There was no muscle atrophy in his upper extremities.  (Tr. 234).  The x-rays of his elbows (Tr. 261-63) revealed "minimal" degenerative joint disease.  Dr. Cho decided claimant did not require any treatment.  (Tr. 234).

In October 2005, Ms. Cosner-Shepherd conducted a consultative psychological evaluation of claimant.  (Tr. 297-302).  He admitted that he drank alcohol "every evening" and usually had about 12 to 14 beers every night.  (Tr. 298).  His social functioning was within normal limits.  (Tr. 301).  His concentration was within normal limits based upon his ability to do serial 7 subtractions.  His persistence was within normal limits.  (Tr. 300-01).

Also in October 2005, Dr. Garner performed an internal medicine consultative PE of claimant.  (Tr. 303-09).  There was no evidence of paravertebral muscular spasm and percussion of his lumbar spinous process was not associated with tenderness.  He stood on one leg at a time without difficulty.  There was no discrepancy in his leg length.  (Tr. 306).  There was no tenderness or palpation of his hips (Tr. 306-07), and he flexed normally at his hips.  (Tr. 307).  There was no evidence of weakness on manual muscle testing.  (Tr. 306-09).  His sensation was

intact.  His reflexes were normal.  He was able to heel, toe and tandem walk, and squat without difficulty.  (Tr. 306-07).  He exhibited normal range of motion of his shoulders, elbows, wrists, knees, hips, ankles, and cervical and lumbar spines.  (Tr. 308-09).

In November 2005, Ms. O'Connor discharged claimant from physical therapy because he had met all of his goals.  He reported no pain in his right ankle/foot complex, even with palpation, and he performed daily activities "without difficult[y]."  (Tr. 333).  Finally, in December 2005, claimant returned to see Dr. Benjamin.  He mentioned some problems with fatigue since he had allowed his Modafinal prescription to lapse.  He complained of "mild" abnormal sensation in his right arm, but he denied having any right arm pain or weakness or neck pain.  On PE, there was no motor weakness or atrophy.  His reflexes were intact.  Dr. Benjamin determined claimant's MS was stable and he may have "mild" radiculopathy in his right arm.  (Tr. 332).

Claimant argues that the ALJ erred when he failed to give the treating physicians opinions of 100% disability controlling weight.  Claimant also avers that the ALJ erred in failing to specify the actual weight that was afforded to the VA rating.  Commissioner maintains that the ALJ was not bound by the VA's disability rating.  Commissioner argues that the ALJ's decision was supported by substantial evidence because claimant did not submit a specific treating physician opinion of disability, nor did he submit the actual medical statement that led to the VA's 100% disability assessment.

It is well settled that in order for a reviewing court to determine whether an ALJ's decision is supported by substantial evidence, the ALJ must outline in his decision the evidence

upon which he relied, and the weight assigned to the relevant evidence. It is the role of the court to address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." Milburn Colliery, 138 F.3d at 528. The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon, 725 F.2d at 235-36.

Claimant argues that the VA rating should have been accorded "great" or "substantial" weight. (Pl.'s Br. at 9). While it is generally true that an ALJ is required to explain the consideration given to an other governmental agency's decision on disability, the ALJ in this case could not have done so because the claimant failed to produce the VA's underlying decision.

It is not the disability rating, but the underlying medical evidence supporting that rating. The ALJ examined this underlying relevant medical evidence and referred to this evidence in making his determination that claimant does not meet or equal a listing. The Court therefore finds that there was substantial evidence to support the ALJ's decision.

2.      Credibility

Claimant asserts that the ALJ erred in determining his credibility. Claimant alleges that the ALJ's credibility determination was "biased" and prevented him from receiving a "fair" and "impartial" hearing. (Pl.'s Br. at 9-13). Commissioner counters that the ALJ properly determining Claimant's credibility.

Unfortunately for Claimant, his argument is without merit. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's

observations concerning these questions are to be given great weight." Shively, 739 F.2d at 889 (citing Tyler, 409 F. Supp. 776). "Because hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson, 131 F.3d at 1237. The ALJ must apply a two-step analysis when assessing the credibility of a claimant's subjective complaints of pain. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Craig, 76 F.3d at 585.

In this case the ALJ correctly applied the Craig test. The ALJ found that Claimant had "medically determinable impairments during the 'initial period at issue' that could reasonably be expected to produce some of the symptoms that he has alleged." (Tr. 16). Although Claimant suffers from impairments that could cause some of the alleged symptoms, the ALJ found that the objective medical evidence did not indicate any intractable symptoms that would have precluded claimant's ability to perform any and all forms of work for any 12 consecutive months during the "initial period at issue." (Tr. 17-18). This satisfies the first prong of Craig.

The ALJ considered Claimant's subjective complaints of pain in light of the entire record in accordance with the second prong of Craig. Of particular importance to the ALJ was claimant's alcohol dependence. "Such activity tends to substantially diminish the claimant's underlying credibility in the absence of objective medical findings that clearly and convincingly support his subjective, impairment-related complaints." (Tr. 19). The ALJ was also concerned with the fact that claimant underwent a hip replacement in 1992 and was diagnosed with MS

around 1993, but continued to work until 2000.  It was at this time that claimant effectively retired after having been awarded a one hundred percent disability from the Department of Veterans Affairs for his hip replacement and MS.  He began receiving a monthly disability pension benefit of $2,523.  (Tr. 17).

The ALJ also assessed claimant's credibility based upon the fact that he was denied on previous attempts at applying for Social Security disability benefits.  "After his first Social Security disability application was denied in 1994, [claimant] returned to the workforce and sustained 'substantial gainful activity' from 1995 through 2000."  (Tr. 16).  The claimant has "demonstrated somewhat of a propensity to seek out available impairment-related financial benefits absent adequately supportive objective medical findings, and has evidenced an ability to perform and sustain highly physical work activity for a number of years after having been diagnosed in 1993 with most of the same impairments as to which he presently complains."  (Tr. 17).

Furthermore, claimant indicated that he continued to hunt and fish on occasion, that he "cleaned" once a month and that he did laundry now and then.  Because of these reasons, the ALJ found that the claimant "has exaggerated the debilitating severity of his impairment-related limitations in order to facilitate contingent secondary interests, within a context that has also involved his ongoing, significant use of alcohol, i.e., activity that is not particularly conducive toward performing and sustaining work activity."  (Tr. 17).

Having considered all the evidence in accordance with the second prong of Craig, the ALJ  is in the best position to determine Claimant's credibility.  Although the ALJ determined that Claimant had medically determinable severe impairments, including residual effects, status

post remote total right hip replacement and core decompression of the left hip; degenerative joint disease of both elbows; history of multiple sclerosis, with associated fatigue; depressive disorder, not otherwise specified; pain disorder associated with psychological factors and general medical condition; and alcohol dependence, with ethanolic peropheral neuropathy, the ALJ also determined that Claimant's testimony was not fully credible and inconsistent with his medical record. Therefore, the ALJ properly assessed Claimant's credibility.

As for claimant's contention that the ALJ's credibility findings were biased and prevented him from receiving a fair and impartial decision, the Court agrees with Commissioner and finds that the ALJ was not biased against claimant.

Claimant alleges the ALJ's comments on his previous applications, claimant's disability pension, his drinking habits and his hobbies that included hunting and fishing, evidence the ALJ was biased against claimant and precluded him from receiving a fair and impartial decision. Commissioner contends the ALJ was not biased against Claimant. Specifically, Commissioner responds that "even if the ALJ erred in some of his fact-finding, as [claimant] avers (Pl.'s Br. at 9-11), this is still not an indication of bias or animus that would effect his ability to rule impartially..." (Commissioner's Br. at 12). Commissioner further argues that "[claimant] has pointed to nothing in the ALJ's decision or in his conduct at the hearing to sustain his heavy burden of proving bias on the ALJ's part." (Comm. Br. at 12).

The Court agrees with Commissioner and finds Claimant has failed to establish the ALJ was biased against him. When analyzing claims of bias against an ALJ, the Court must start from the presumption that ALJs are unbiased. See Schweiker v. McClure, 456 U.S. 188, 195-96 (1982), and that they exercise their decision-making authority with honesty and integrity. See

<u>Withrow v. Larkin</u>, 421 U.S. 35, 47 (1975). These presumptions can only be rebutted by showing a conflict of interest existed or by showing some other specific reason for disqualification. <u>See</u> <u>Schweiker</u>, 456 U.S. at 195.

While the ALJ seemed greatly concerned by claimant's past applications for social security benefits, as well as the fact that the VA disability determination might have caused a disincentive for claimant to pursue work, the ALJ is permitted to consider the entire record, including evidence of claimant's possible motivations for secondary gain, <u>Gaddis v. Chater</u>, 76 F.3d 893, 896 (8th Cir. 1996).

Regarding the ALJ's discussion of claimant's history of alcohol consumption, the ALJ did not, as claimant suggests, take a "biased stance that the drinking was entirely unacceptable to him and dismiss the case on some type of moral ground." (Pls. Br. at 12). Rather, the ALJ simply found that claimant's alcohol use tended to diminish his credibility because of his inconsistent claims regarding his alcohol use and his attempt to diminish his use at the hearing. (Tr. 19). Claimant testified that he consumed only a "couple" of beers nightly, maybe 3 or 4 beers. (Tr. 52). He told Ms. Cosner-Shepherd that he had consumed 12 to 14 beers nightly for between 7 to 10 years (Tr. 298). In 2006, claimant told the VAMC that he consumed up to 12 beers a night. The ALJ correctly determined that this inconsistency undermined claimant's credibility. (Tr. 19). The ALJ took this into account in making his overall credibility determination and it does not show bias on the part of the ALJ.

### IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **DENIED** because substantial

evidence supports the ALJ's decision. Specifically, the Court finds that the ALJ was not bound by the Veterans Affairs finding of 100% disability. Furthermore, the ALJ showed no bias and his credibility findings were supported by substantial evidence

      2.      Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

      Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days of the date of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: October 22, 2008

                    /s/ *James E. Seibert*

                    JAMES E. SEIBERT

                    UNITED STATES MAGISTRATE JUDGE